**Opinion issued December 22, 2020**



In The

# Court of Appeals

For The

# First District of Texas

———————————

**NO. 01-20-00507-CV**

———————————

## IN THE INTEREST OF D.L.W.W., J.A.W., AND A.M.M., CHILDREN

---

**On Appeal from the 313th District Court**
**Harris County, Texas**
**Trial Court Case No. 2018-03930J**

---

### O P I N I O N

In this accelerated appeal,[1] appellant, mother, challenges the trial court's

order, entered after a bench trial, terminating her parental rights to her minor child,

A.M.M., and awarding the Department of Family and Protective Services ("DFPS")

sole managing conservatorship of mother's minor children, D.L.W.W., J.A.W., and

---

[1]     *See* TEX. FAM. CODE ANN. § 263.405(a); TEX. R. APP. P. 28.4.

A.M.M. (collectively, the "children").[2] Appellant, father, challenges the trial court's order, entered after a bench trial, terminating his parental rights to his minor child, A.M.M. In four issues, mother contends that the trial court erred in appointing DFPS as the sole managing conservator of the children[3] and the evidence is legally and factually insufficient to support the trial court's findings that she engaged, or knowingly placed A.M.M. with persons who engaged, in conduct that endangered the child's physical and emotional well-being;[4] she failed to comply with the provisions of a court order that specifically established the actions necessary for her to obtain the return of A.M.M.;[5] and termination of her parental rights was in the best interest of A.M.M.[6] In three issues, father contends that the evidence is legally and factually insufficient to support the trial court's findings that he engaged, or knowingly placed A.M.M. with persons who engaged, in conduct that endangered the child's physical and emotional well-being;[7] he failed to comply with the provisions of a court order that specifically established the actions necessary for him

---

[2]  At the time the trial court entered its order on June 24, 2020, D.L.W.W. was twelve years old, J.A.W. was ten years old, and A.M.M. was two years old. The trial court did not terminate mother's parental rights to D.L.W.W. and J.A.W.

[3]  *See* TEX. FAM. CODE ANN. § 263.404; *see also id.* § 161.205.

[4]  *See id.* § 161.001(b)(1)(E).

[5]  *See id.* § 161.001(b)(1)(O).

[6]  *See id.* § 161.001(b)(2).

[7]  *See id.* § 161.001(b)(1)(E).

to obtain the return of A.M.M.;[8] and termination of his parental rights was in the best interest of A.M.M.[9]

We affirm in part and reverse and remand in part.

## Background[10]

On August 2, 2018, DFPS filed a petition seeking termination of mother's parental rights to the children and termination of father's parental rights to A.M.M. DFPS also sought managing conservatorship of the children.

### *DFPS Caseworker Deese*

At trial, DFPS caseworker Natasha Deese testified that DFPS filed its petition seeking termination of the parental rights of mother and father "due to substance abuse" and because mother and father were "not compliant" with DFPS's Family Based Safety Services ("FBSS").[11] Deese, without detail or timeframe, stated that mother and father "kept testing positive" for marijuana and cocaine use.

---

[8] *See id.* § 161.001(b)(1)(O).

[9] *See id.* § 161.001(b)(2).

[10] The background portion of the opinion discusses the evidence presented at trial. *See In re E.F.*, 591 S.W.3d 138, 142 n.4 (Tex. App.—San Antonio 2019, no pet.) ("Although we recognize the trial court and the parties in this proceeding had many hearings before the date of trial, we emphasize that none of the previous hearings constitute evidence that can support the trial court's order terminating a parent's rights. The only evidence that can support the trial court's order is that evidence *admitted at trial*." (emphasis added)).

[11] *See generally In re L.A.*, No. 02-16-00403-CV, 2017 WL 1289362, at *1 (Tex. App.—Fort Worth Apr. 6, 2017, no pet.) (mem. op.) ("[T]he purpose of FBSS is to provide a less stringent alternative to legal action or removal of [a] child by

3

Deese further testified that mother and father participated in narcotics-use and alcohol-use testing during this case. Mother and father tested negative for narcotics use on November 20, 2019.[12] Mother and father also tested negative for narcotics use in September 2019. Father tested negative for narcotics use on July 10, 2019. And Deese stated that mother and father tested negative for narcotics use on May 1, 2019.[13] When asked whether mother and father had tested negative for narcotics use for "multiple months," Deese responded, "That is correct." Deese stated that mother had not tested positive for narcotics use by urinalysis since August 23, 2018. Deese also confirmed that father had tested negative for alcohol use "over the last year and a half, almost two years" before trial.[14] Father last tested positive for narcotics use in September 2018, right after the termination case began.[15]

At the time of trial, the children were placed in separate foster homes, which Deese described as "good." The children did not have any special needs.

---

providing families with service plans using resources within the family's community.").

[12] Deese stated that November 20, 2019 was the last time that mother and father were asked to submit to narcotics-use testing.

[13] Deese contradicted herself during her testimony and stated that mother last tested positive for cocaine use on May 1, 2019 by a hair-follicle test.

[14] Deese contradicted herself during her testimony and stated that father last tested positive for alcohol use on July 10, 2019.

[15] Deese stated that father tested positive for cocaine, benzodiazepine, and alcohol use in September 2018.

Deese stated that DFPS was seeking termination of the parental rights of mother and father because they failed to comply with their Family Service Plans ("FSPs")[16] and DFPS had not received a recommendation from a therapist stating that the children should be returned home.[17] However, Deese explained that D.L.W.W. and J.A.W.'s therapist did not say that the children should not be returned to mother's care or father's care, DFPS had simply not received any recommendation or feedback from the therapist.[18] Deese acknowledged that mother and father had engaged in the services required by their FSPs and mother and father had completed "everything" on their FSPs. Yet, Deese stated that termination of mother's parental rights to the children was in the children's best interest because they were young and DFPS had a lot of permanent-managing conservatorship cases which "get stagnant."

In regard to family therapy, Deese stated that the requirement of participating in family therapy was added to mother's and father's FSPs later on in the case, and mother and father were still participating in family-therapy sessions with D.L.W.W.

---

[16] The trial court did not admit into evidence at trial a copy of either mother's or father's FSP. *See In re E.F.*, 591 S.W.3d at 142 n.4 ("The only evidence that can support the trial court's order is that evidence *admitted at trial*." (emphasis added)).

[17] During Deese's testimony, she did not clarify what she meant by "return[ed] home," i.e., to whose home the children would be returning.

[18] Deese did not testify that DFPS had actually sought a recommendation from D.L.W.W. and J.A.W.'s therapist as to whether the children should be "return[ed] home."

and J.A.W. at the time of trial.[19]  When family-therapy sessions began in January 2020, mother and father were participating in face-to-face visits with the family therapist.  Mother and father then began participating in family-therapy sessions via Zoom, a videoconferencing platform, because of the COVID-19 pandemic.[20]  Deese did not know the date of the last family-therapy session before trial.  Although Deese stated that father had been absent from many Zoom-family-therapy sessions, she stated that he did not own a computer; he only had a cellular telephone.[21]

As to mother, Deese testified that mother had her own home, which was stable and suitable for the children.  Mother did not have a job, but she received disability payments which DFPS considered to be mother's income.  At the time of trial, mother was participating in a "12-Step Program" through Alcoholics Anonymous

---

[19]     It is unclear from the record whether mother and father were required to participate in family-therapy sessions with A.M.M. or whether A.M.M. participated in family-therapy sessions with her older siblings or parents.

[20]     *See In re Landstar Ranger, Inc.*, No. 06-20-00047-CV, 2020 WL 5521136, at *4 (Tex. App.—Texarkana Sept. 15, 2020, no pet.) (mem. op.) (noting that "[a]s a result of the onset of the COVID-19 pandemic, on March 13, 2020, Texas Governor Greg Abbott issued a disaster proclamation certifying that COVID-19 posed an imminent threat of disaster for all counties in the state of Texas[, and] . . . Governor Abbott instituted health protocols, such as minimizing in-person contact, maintaining six feet between individuals, and suggesting that people wear masks when in the presence of other individuals"); *see also United States v. Sheppard*, Criminal Action No. 5:17-CR-00026-TBR, 2020 WL 6534326, at *1 (W.D. Ky. Nov. 5, 2020) (mem. op. and order) (noting "Zoom" is "a video conferencing platform" that has been utilized during COVID-19 pandemic due to safety and health concerns surrounding in-person proceedings).

[21]     The record does not indicate whether father's cellular telephone was equipped to use Zoom.

("AA"). Mother was working with a sponsor, and she was on "Step 6" of the program. There was no requirement that mother complete her "12-Step Program" for the children to be returned to her care, but completion of the program was just something that DFPS "would like to see."

Deese also testified that mother had completed her required parenting classes and her psychosocial evaluation, she had followed the recommendations from her psychosocial evaluation, and she had finished individual therapy. According to Deese, mother had been "actively participating in th[e] case," had attended court hearings, and had visits with the children. Deese described mother's visits with the children as "good." Deese expressed concern that mother and father had two incidents during their visits in which they disagreed in front of the children, but Deese stated that there were no physical altercations between mother and father.[22] Deese described the two incidents as "a verbal back and forth," and she stated that it was not unexpected that mother and father would bicker during a stressful situation.

Deese noted that DFPS had considered returning the children to mother's care, but she stated that DFPS wanted "a recommendation from a professional person stating that . . . it[] [was] okay to return the[] kids."[23] Deese stated that she was

---

[22] It is unclear from the record whether all three children attended visits with mother and father together or whether mother's and father's visits with A.M.M. were separate from their visits with D.L.W.W. and J.A.W.

[23] Deese did not explain the type of "professional person" from whom DFPS wanted a recommendation, and she did not indicate that DFPS had actually sought a

7

concerned about mother's purported and unspecified "intellectual disabilities" because Deese thought it would impact mother's ability to parent the children.[24] Deese acknowledged that mother had never been diagnosed with any intellectual disabilities.

Deese testified that mother loved the children, and the children loved her. D.L.W.W. and J.A.W. had stated that they wanted to return to mother's care. When mother called D.L.W.W. for his birthday, she was "very sweet to him[] [and] kind," and mother was "part of" J.A.W.'s birthday celebration as well. A.M.M.'s foster parent had described mother's bond with A.M.M. as "healthy" and stated that mother was "positive around" A.M.M. during their Zoom visitations. A.M.M. could not verbalize with whom she would like to live. When Deese had observed mother's visits with the children, mother acted appropriately. Deese had not seen mother hurt the children or "say something negative."

As to father, Deese testified that father lived with his mother and he had been employed "off and on with his job." Deese did not know if father had a job at the time of trial, but she speculated that "he probably ha[d] obtained a new one." Deese believed that father's home with his mother was not stable because his name was not

---

recommendation from any "professional person" about the children returning to mother's care.

[24] Deese provided little detail concerning mother's purported "intellectual disability," beyond stating that mother "thank[ed] God for everything" and "for her distress, it's kind of hard."

on the lease agreement and Deese thought that father's mother had a "criminal history."[25] Deese opined that father "need[ed] his own place." However, Deese testified that it had been discussed that father could be awarded possessory conservatorship of A.M.M. regardless of whether A.M.M. was returned to mother's care or if she stayed in her current foster placement. According to Deese, DFPS did not "have a problem" with father being appointed as a possessory conservator of A.M.M.

Deese also testified that father was participating in a "12-Step Program" with a sponsor and he had previously show her "slips" indicating that he was participating in Narcotics Anonymous ("NA").

In regard to father's visits with A.M.M., Deese stated that father sometimes made unspecified "inappropriate comments," but this was not expanded upon. Deese could not testify as to whether father and A.M.M. were bonded, but she stated that when their visits were in-person, A.M.M. recognized father. During Zoom visitations, father talked to A.M.M. Father also had visits with D.L.W.W. and J.A.W. even though he was not their biological father. Father was "pretty good" with them, and they were bonded with father.

---

[25] The record does not contain any detail as to the "criminal history" of father's mother.

As to D.L.W.W. and J.A.W., Deese testified that they were not in an adoptive placement or a permanent home at the time of trial and their current caregiver did not want to be awarded conservatorship of them. Deese hoped that DFPS could find D.L.W.W. and J.A.W. an adoptive home.

As to A.M.M., Deese described her current foster placement as safe. A.M.M. had been in the same foster home since the case started. A.M.M.'s foster family was willing to raise her, even if A.M.M. still had contact with mother and father. A.M.M. was thriving in her placement, and Deese believed that it was in A.M.M.'s best interest for her to remain in her current foster placement.

### Child Advocates Volunteer Philo

Child Advocates Inc. ("Child Advocates") volunteer Jillian Philo testified that it was in the best interest of A.M.M. for mother's and father's parental rights to A.M.M. to be terminated because A.M.M. had been in a stable, loving foster home for most of her life.[26] Philo stated that A.M.M.'s current foster placement was an adoptive home.

According to Philo, father did not have stable housing and A.M.M. was vulnerable due to her age. Philo acknowledged that father had completed his FSP,

---

[26] Philo acknowledged that a Child Advocates' report had been filed with the trial court that recommended that the parental rights of mother and father not be terminated. A copy of this report was not admitted into evidence at trial. *See In re E.F.*, 591 S.W.3d at 142 n.4 ("The only evidence that can support the trial court's order is that evidence *admitted at trial*." (emphasis added)).

10

and father had not tested positive for alcohol use since July 2019. During his in-person visits with A.M.M., father was appropriate with the child. Father and A.M.M. were bonded, and father loved A.M.M. A.M.M.'s foster family was willing to allow father to remain in A.M.M.'s life if acceptable terms could be reached. Father "want[ed] his daughter back."

Philo cited mother's purported intellectual "impairment" as a reason for A.M.M. not to be returned to her care, and generally, without detail, concluded that an unspecified grandfather could not provide support for mother because abuse allegations had "com[e] out."[27] Philo acknowledged that mother had never been diagnosed with an intellectual impairment or intellectual disability, and no expert had ever reported that mother had an intellectual problem.

As to D.L.W.W. and J.A.W., Philo recommended that mother's parental rights to D.L.W.W. and J.A.W. not be terminated. Instead, DFPS should be awarded managing conservatorship of D.L.W.W. and J.A.W. so that mother could be given more time to address any issues and could be reunited with D.L.W.W. and J.A.W. Philo also generally stated that D.L.W.W. and J.A.W.'s therapist had heard about "domestic violence situations," but Philo did not provide any context or detail

---

[27] It is not clear from in the trial record the identity of the grandfather, what sort of abuse allegations had "com[e] out," and if those abuse allegations related to mother or father in any way.

11

regarding any purported domestic violence.[28]  According to Philo, family reunification for mother and D.L.W.W. and J.A.W. had been the goal for a majority of the case and mother had done everything that she had been asked to do to be reunited with D.L.W.W. and J.A.W.  Even when "new issues ha[d] evolved" during the case, mother had been agreeable to working to make sure she was a better parent.  Mother had always been willing to complete whatever requirements had been asked of her.  When asked whether mother was a danger to D.L.W.W. and J.A.W., Philo did not state that it would be dangerous or detrimental for D.L.W.W. or J.A.W. to be returned to mother's care.  She only stated that she thought mother might "struggle" due to her purported intellectual disability.[29]  Philo admitted that mother had parented D.L.W.W. and J.A.W. for "quite some time" before they were removed from mother's care.

In regard to the current placement for D.L.W.W. and J.A.W., Philo stated that it was not a positive home or a long-term placement, and she did not want D.L.W.W. and J.A.W. to stay in their placement.  D.L.W.W. and J.A.W. desperately wanted to return to mother's care, and mother wanted them returned to her care.  D.L.W.W. and J.A.W. were not happy in their placement.  It was in D.L.W.W. and J.A.W.'s

---

[28]  Philo did not testify about any specific domestic violence allegation and did not indicate that mother or father had engaged in domestic violence.

[29]  Again, Philo acknowledged that mother had never been diagnosed with an intellectual impairment or intellectual disability, and no expert had ever reported that mother had an intellectual problem.

12

best interest for mother to be given more time and for mother's parental rights not to be terminated.

### *Mother*

Mother testified that she would like the children returned to her care, and she asked that the trial court not terminate her parental rights to the children. Mother stated that she loved the children.

Mother explained that she had completed the requirements that had been asked of her, and she was capable of parenting the children. She had the financial ability to care for the children and a place for the children to live. Mother intended to continue participating in AA and working on her "12-Step Program" even after the children were returned to her care. She agreed to comply with any requirements that would be placed on her so that her children could be returned to her care. And she was willing to work with A.M.M.'s foster family in order to be able to maintain contact with A.M.M. if the child was not returned to mother's care. If D.L.W.W. and J.A.W. were returned to her care, mother was willing to participate in in-home parenting classes.

Mother did acknowledge that in 2011 and 2014 she was convicted of the offense of prostitution and she was sentenced to ten days' confinement for each offense. Mother stated that she had not had any "criminal law problems" since 2014.

As to allegations of domestic violence, mother stated that father had never struck her, hit her, pushed her, or kicked her. Father had been "mean towards [her]" in the presence of D.L.W.W. and J.A.W., but father had not verbally abused her in the presence of D.L.W.W. and J.A.W. Father did not yell at mother and did not use curse words in front of the children. He also did not call her names in front of the children. Father sometimes used a harsh tone.

Finally, mother testified that she had not used marijuana since 2017 or 2018, she had not used methamphetamine since 2017, and she did not use cocaine.

*Father*

Father testified that A.M.M. was his daughter. He described his relationship with A.M.M. as "[a]wesome." Father loved A.M.M. He requested that the trial court not terminate his parental rights to the child. Father was willing to work out an agreement where A.M.M. could remain with her foster family and he could have visitation with A.M.M.

Father acknowledged that A.M.M. was thriving in her current placement with her foster family. Father was willing to provide financial support to A.M.M.'s foster family if his parental rights were not terminated but A.M.M. remained in the care of her foster family.

Father acknowledged that, at the beginning of the termination case, he tested positive for narcotics use and alcohol use. Father stated that at the time of trial, he

14

had been participating in AA for a year and he attended AA meetings once or twice a week.[30]  Father also participated in NA.  He had not tested positive for narcotics use or alcohol use for more than a year.  Father testified that he had last used cocaine and methamphetamine at the end of 2018 and he had last used marijuana about a year before trial.  It had been a year since father had consumed alcohol.  Father was convicted of the offense of possession of a controlled substance, namely cocaine, in September 2014, and his punishment was assessed at confinement for thirty days. He had not had any "criminal law problem[s]" since 2014.

As to his FSP, father stated that he had completed it, and he had stayed in contact with DFPS caseworker Deese.

### Standard of Review

A parent's right to "the companionship, care, custody, and management" of her child is a constitutional interest "far more precious than any property right." *Santosky v. Kramer*, 455 U.S. 745, 758–59 (1982) (internal quotations omitted).  The United States Supreme Court has emphasized that "the interest of [a] parent[] in the care, custody, and control of [her] child[] . . . is perhaps the oldest of the fundamental liberty interests recognized by th[e] Court."  *Troxel v. Granville*, 530 U.S. 57, 65 (2000).  Likewise, the Texas Supreme Court has concluded that "[t]his

---

[30]     Father contradicted himself during his testimony and stated that he had been participating in AA for a couple of months before trial.

natural parental right" is "essential," "a basic civil right of man," and "far more precious than property rights." *Holick v. Smith*, 685 S.W.2d 18, 20 (Tex. 1985) (internal quotations omitted). Consequently, "[w]e strictly construe involuntary termination statutes in favor of the parent." *In re E.N.C.*, 384 S.W.3d 796, 802 (Tex. 2012).

Because termination of parental rights is "complete, final, irrevocable and divests for all time that natural right . . . , the evidence in support of termination must be clear and convincing before a court may involuntarily terminate a parent's rights." *Holick*, 685 S.W.2d at 20. Clear and convincing evidence is "the measure or degree of proof that will produce in the mind of the trier of fact a firm belief or conviction as to the truth of the allegations sought to be established." TEX. FAM. CODE ANN. § 101.007; *see also In re J.F.C.*, 96 S.W.3d 256, 264 (Tex. 2002). Because the standard of proof is "clear and convincing evidence," the Texas Supreme Court has held that the traditional legal and factual standards of review are inadequate. *In re J.F.C.*, 96 S.W.3d at 264–68.

In conducting a legal-sufficiency review in a termination-of-parental-rights case, we must determine whether the evidence, viewed in the light most favorable to the finding, is such that the fact finder could reasonably have formed a firm belief or conviction about the truth of the matter on which DFPS bore the burden of proof. *Id.* at 266. In viewing the evidence in the light most favorable to the finding, we

"must assume that the factfinder resolved disputed facts in favor of its finding if a reasonable factfinder could do so," and we "should disregard all evidence that a reasonable factfinder could have disbelieved or found to have been incredible." *In re J.P.B.*, 180 S.W.3d 570, 573 (Tex. 2005) (internal quotations omitted). But this does not mean we must disregard all evidence that does not support the finding. *In re J.F.C.*, 96 S.W.3d at 266. Because of the heightened standard, we must also be mindful of any undisputed evidence contrary to the finding and consider that evidence in our analysis. *Id.* If we determine that no reasonable trier of fact could form a firm belief or conviction that the matter that must be proven is true, we must hold the evidence to be legally insufficient and render judgment in favor of the parent. *Id.*

In conducting a factual-sufficiency review in a termination-of-parental-rights case, we must determine whether, considering the entire record, including evidence both supporting and contradicting the finding, a fact finder reasonably could have formed a firm conviction or belief about the truth of the matter on which DFPS bore the burden of proof. *In re C.H.*, 89 S.W.3d 17, 25–26 (Tex. 2002). We should consider whether the disputed evidence is such that a reasonable fact finder could not have resolved the disputed evidence in favor of its finding. *In re J.F.C.*, 96 S.W.3d at 266. "If, in light of the entire record, the disputed evidence that a reasonable factfinder could not have credited in favor of the finding is so significant

17

that a factfinder could not reasonably have formed a firm belief or conviction, then the evidence is factually insufficient." *In re H.R.M.*, 209 S.W.3d 105, 108 (Tex. 2006) (internal quotations omitted).

**Termination of Parental Rights**

In her first and third issues, mother argues that the trial court erred in terminating her parental rights to A.M.M. because the evidence is legally and factually insufficient to support the trial court's findings that she engaged, or knowingly placed A.M.M. with persons who engaged, in conduct that endangered the child's physical and emotional well-being and termination of her parental rights was in the best interest of A.M.M. *See* Tex. Fam. Code Ann. § 161.001(b)(1)(E), (b)(2).

In his first and third issues, father argues that the trial court erred in terminating his parental rights to A.M.M. because the evidence is legally and factually insufficient to support the trial court's finding that he engaged, or knowingly placed A.M.M. with persons who engaged, in conduct that endangered the child's physical and emotional well-being and termination of his parental rights was in the best interest of A.M.M. *See id.*

In order to terminate the parent-child relationship, DFPS must establish, by clear and convincing evidence, one or more of the acts or omissions enumerated in Texas Family Code section 161.001(b)(1) and that termination of parental rights is

in the best interest of the child. *See id.* § 161.001(b). Both elements must be established, and termination may not be based solely on the best interest of the child as determined by the trier of fact. *Id.*; *Tex. Dep't of Human Servs. v. Boyd*, 727 S.W.2d 531, 533 (Tex. 1987). "Only one predicate finding under section 161.001[(b)](1) is necessary to support a judgment of termination when there is also a finding that termination is in the child's best interest." *In re A.V.*, 113 S.W.3d 355, 362 (Tex. 2003).

## A. Endangering Conduct

In a portion of her first issue, mother argues that the evidence is legally insufficient[31] to support the trial court's finding that she engaged, or knowingly placed A.M.M. with persons who engaged, in conduct that endangered the child's physical and emotional well-being because a single act or omission did not constitute a voluntary, deliberate, and conscious course of conduct by mother, mother's criminal history was remote, and although mother had substance-abuse issues, she

---

[31] When a party presents multiple grounds for reversal, an appellate court should first address those issues that would afford the party the greatest relief. *See Bradleys' Elec., Inc. v. Cigna Lloyds Ins. Co.*, 995 S.W.2d 675, 677 (Tex. 1999); *In re A.A.H.*, Nos. 01-19-00612-CV, 01-19-00748-CV, 2020 WL 1056941, at *7 n.4 (Tex. App.—Houston [1st Dist.] Mar. 5, 2020, no pet.) (mem. op.). Because legally insufficient evidence requires a rendition of judgment in favor of the party raising the challenge, we must address a legal-sufficiency challenge first. *See In re A.A.H.*, 2020 WL 1056941, at *7 n.4; *In re L.N.C.*, 573 S.W.3d 309, 315 (Tex. App.— Houston [14th Dist.] 2019, pet. denied).

19

was still participating in a "12-Step Program" and other services to address those issues.

In a portion of his first issue, father argues that the evidence is legally insufficient[32] to support the trial court's finding that he engaged, or knowingly placed A.M.M. with persons who engaged, in conduct that endangered the child's physical and emotional well-being because there was no evidence of a voluntary, deliberate, and conscious course of conduct by father, no narcotics-use or alcohol-use testing results were admitted into evidence at trial, father only tested positive for narcotics use at the beginning of the case, DFPS agreed that father had addressed his issue related to alcohol abuse, and there was no actual evidence of domestic violence between mother and father.

A trial court may terminate the parent-child relationship if it finds by clear and convincing evidence that the parent has "engaged in conduct or knowingly placed [a] child with persons who engaged in conduct which endanger[ed] the physical or emotional well-being of the child" and termination is in the best interest of the child. TEX. FAM. CODE ANN. § 161.001(b)(1)(E), (b)(2). Within this context, endangerment encompasses "more than a threat of metaphysical injury or the possible ill effects of a less-than-ideal family environment." *Boyd*, 727 S.W.2d at

---

[32] *See Bradleys' Elec., Inc.*, 995 S.W.2d at 677; *In re A.A.H.*, 2020 WL 1056941, at *7 n.4; *In re L.N.C.*, 573 S.W.3d at 315.

20

533.  Instead, "endanger" means to expose the child to loss or injury or to jeopardize her emotional or physical health.  *Id.* (internal quotations omitted); *see also Walker v. Tex. Dep't of Family & Protective Servs.*, 312 S.W.3d 608, 616 (Tex. App.—Houston [1st Dist.] 2009, pet. denied).

We must look at a parent's conduct standing alone, including her actions or omissions.  *In re J.W.*, 152 S.W.3d 200, 205 (Tex. App.—Dallas 2004, pet. denied).  It is not necessary to establish that a parent intended to endanger the child.  *See In re M.C.*, 917 S.W.2d 268, 270 (Tex. 1996).  But termination of parental rights requires "more than a single act or omission; a voluntary, deliberate, and conscious course of conduct by the parent is required."  *In re J.T.G.*, 121 S.W.3d 117, 125 (Tex. App.—Fort Worth 2003, no pet.); *see also In re J.W.*, 152 S.W.3d at 205.

This Court has previously stated that illegal narcotics use and its effect on a parent's life and the ability to parent may constitute an endangering course of conduct.  *See, e.g.*, *In re A.A.M.*, 464 S.W.3d 421, 426–27 (Tex. App.—Houston [1st Dist.] 2015, no pet.); *see also In re J.O.A.*, 283 S.W.3d 336, 345 (Tex. 2009) ("[E]ndangering conduct may include the parent's actions before the child's birth, while the parent had custody of older children, including evidence of drug usage.").  And we have concluded that illegal narcotics use may support termination under Texas Family Code section 161.001(b)(1)(E).  *See Walker*, 312 S.W.3d at 617–18; *see also In re N.J.H.*, 575 S.W.3d 822, 832–33 (Tex. App.—Houston [1st Dist.]

21

2018, pet. denied) ("[A] parent's decision to engage in illegal drug use during the pendency of a termination suit, when the parent is at risk of losing a child, may support a finding that the parent engaged in conduct that endangered the child's physical or emotional well-being." (alteration in original) (internal quotations omitted)); *Vasquez v. Tex. Dep't of Protective & Regulatory Servs.*, 190 S.W.3d 189, 195–96 (Tex. App.—Houston [1st Dist.] 2005, pet. denied).

Here, it is undisputed that mother and father used illegal narcotics at the beginning of this case. Although narcotics-use testing results were not admitted into evidence at trial,[33] DFPS caseworker Deese testified that DFPS filed its petition on August 2, 2018 seeking termination of the parental rights of mother and father in part "due to substance abuse" because mother and father had tested positive for marijuana use and cocaine use at some point. According to Deese, mother tested positive for narcotics use by urinalysis on August 23, 2018.[34] Father testified positive for cocaine and benzodiazepine use in September 2018.

---

[33] To the extent that the clerk's record or the reporter's record from a non-trial hearing contains information regarding mother's and father's narcotics use, we may not consider such information when determining whether the evidence is legally sufficient to support the trial court's order because such information was not admitted as evidence at trial. *See In re E.F.*, 591 S.W.3d at 142 n.4 ("The only evidence that can support the trial court's order is that evidence *admitted at trial*." (emphasis added)).

[34] Deese contradicted herself during her testimony, stating at one point that mother tested positive for cocaine use on May 1, 2019 by a hair-follicle test, and at another point, that mother tested negative for narcotics use on May 1, 2019.

Mother testified that she last used marijuana in 2017 or 2018 and she last used methamphetamine in 2017.[35] Father testified that, at the beginning of the termination case, he tested positive for narcotics use. Father last used cocaine and methamphetamine at the end of 2018, and he last used marijuana about a year before trial. Father admitted he had been convicted of the offense of possession of a controlled substance, namely cocaine, in September 2014 and his punishment was assessed at confinement for thirty days.

Viewing the evidence in the light most favorable to the trial court's findings, as we must when conducting a legal-sufficiency review, we conclude that the trial court could have formed a firm belief or conviction that mother and father engaged, or knowingly placed A.M.M. with persons who engaged, in conduct that endangered

---

[35] In her brief, mother states that A.M.M. was removed from her care because both she and A.M.M. tested positive for marijuana use at the time of A.M.M.'s birth on November 29, 2017. But, in other portions of her brief, mother states that only she tested positive for marijuana use at the time of A.M.M.'s birth. And, in another portion of her brief, mother states that it was A.M.M. who tested positive for marijuana use at birth, which resulted in her being removed from mother's care. No one presented any evidence at trial establishing whether mother or A.M.M. or both tested positive for marijuana use at the time of A.M.M.'s birth. In fact, no evidence about A.M.M.'s birth or the circumstances surrounding the birth was even admitted at trial. *See id.* ("The only evidence that can support the trial court's order is that evidence *admitted at trial*." (emphasis added)). We have discretion as to whether to accept a statement made in a party's brief as a judicial admission. *See Wells Fargo Bank, N.A. v. Smuck*, 407 S.W.3d 830, 842 (Tex. App.—Houston [14th Dist.] 2013, pet. denied). And given that the statements in mother's brief about marijuana use are not sufficiently clear or unequivocal, we do not consider them to be judicial admissions. *See, e.g., Fayette Cty. v. Ryder Integrated Logistics, Inc.*, No. 04-16-00574-CV, 2017 WL 1244440, at *3 n.1 (Tex. App.—San Antonio Apr. 5, 2017, no pet.) (mem. op.).

23

the child's physical and emotional well-being. *See* TEX. FAM. CODE ANN. § 161.001(b)(1)(E). We hold that the evidence is legally sufficient to support the trial court's findings that mother and father engaged, or knowingly placed A.M.M. with persons who engaged, in conduct that endangered the child's physical and emotional well-being. *See id.*

We overrule this portion of mother's first issue and this portion of father's first issue.

Having held that the evidence is legally sufficient to support the trial court's finding that mother and father engaged, or knowingly placed A.M.M. with persons who engaged, in conduct that endangered the child's physical and emotional well-being, we need not address the portion of mother's second issue in which she asserts that the evidence is legally insufficient to support the trial court's finding that she failed to comply with the provisions of a court order that specifically established the actions necessary for her to obtain the return of A.M.M. *See id.* § 161.001(b)(1)(O); *In re A.V.*, 113 S.W.3d at 362 (only one predicate finding under Texas Family Code section 161.001(b)(1) necessary to support judgment terminating parental rights); *see also* TEX. R. APP. P. 47.1. We also need not address the portion of father's second issue in which he asserts that the evidence is legally insufficient to support the trial court's finding that he failed to comply with the provisions of a court order that specifically established the actions necessary for him

24

to obtain the return of A.M.M. *See* TEX. FAM. CODE ANN. § 161.001(b)(1)(O); *In re A.V.*, 113 S.W.3d at 362; *see also* TEX. R. APP. P. 47.1.

Additionally, due to our disposition below,[36] we need not address the portions of mother's first and second issues in which she asserts that the evidence is factually insufficient to support the trial court's findings that she engaged, or knowingly placed A.M.M. with persons who engaged, in conduct that endangered the child's physical and emotional well-being and that she failed to comply with the provisions of a court order that specifically established the actions necessary for her to obtain the return A.M.M. *See* TEX. FAM. CODE ANN. § 161.001(b)(1)(E), (O). We also need not address the portions of father's first and second issues in which he asserts that the evidence is factually insufficient to support the trial court's findings that he engaged, or knowingly placed A.M.M. with persons who engaged, in conduct that

---

[36] Because we reverse the portion of the trial court's order terminating the parental rights of mother and father to A.M.M. and remand the case to the trial court for a new trial after concluding that the evidence is factually insufficient to support the trial court's best-interest findings, *see infra*, we do not run afoul of the Texas Supreme Court's decision in *In re N.G.*, 577 S.W.3d 230 (Tex. 2019), by not considering whether the evidence is factually insufficient to support the trial court's findings that mother and father engaged, or knowingly placed A.M.M. with persons who engaged, in conduct that endangered the child's physical and emotional well-being. *See In re D.T.*, Nos. 07-19-00071-CV, 07-19-00072-CV, 2019 WL 3210601, at *5 n.6 (Tex. App.—Amarillo July 16, 2019, no pet.) (mem. op.); *see also* TEX. FAM. CODE ANN. § 161.001(1)(b)(E); *In re N.G.*, 577 S.W.3d at 237, 239 (*only* when appellate court "*affirms the termination*" of parental rights under section 161.001(b)(1)(E) must it address both legal and factual sufficiency of evidence "to support [a] section 161.001(b)(1)([E]) . . . finding[] as [a] ground[] for termination" (emphasis added)).

endangered the child's physical and emotional well-being and that he failed to comply with the provisions of a court order that specifically established the actions necessary for him to obtain the return A.M.M. *See id.* This is because, even were we to sustain any of the factual-sufficiency challenges raised by mother and father in their first and second issues, mother and father would not be granted any more relief related to the termination of their parental rights to A.M.M. than we have afforded them below. *See In re A.A.H.*, Nos. 01-19-00612-CV, 01-19-00748-CV, 2020 WL 1056941, at *18 (Tex. App.—Houston [1st Dist.] Mar. 5, 2020, no pet.) (mem. op.); *see also* TEX. R. APP. P. 47.1.

## B.   Best Interest of A.M.M.

In her third issue, mother argues that the evidence is legally and factually insufficient to support the trial court's finding that termination of her parental rights was in the best interest of A.M.M. because DFPS had the burden to prove that termination of mother's parental rights was in the best interest of A.M.M., mother completed her FSP and extra parenting classes, mother participated in family-therapy sessions when it was added to her FSP, mother attended all hearings and visits, mother's interaction with A.M.M. was appropriate, mother had not "relapse[d] during the pendency of the case," mother was participating in her "12-Step Program," mother's criminal history was remote, mother was financially able to care for A.M.M., mother's home was suitable for A.M.M., mother was

26

willing to continue participating in AA and attend additional parenting classes, and mother did not pose a physical or emotional danger to A.M.M.

In his third issue, father argues that the evidence is legally and factually insufficient to support the trial court's finding that termination of his parental rights was in the best interest of A.M.M. because there was a bond between A.M.M. and father, A.M.M.'s foster family was "willing to work out visitation and access with . . . father" which "removed the necessity of terminat[ing] [father's parental] rights," father had a previous role in parenting mother's older children, D.L.W.W. and J.A.W., which weighed against terminating his parental rights to A.M.M., little evidence concerning the stability of father's home was presented, and the evidence at trial used to support the trial court's best-interest finding was scant, vague, and conclusory.

The best-interest analysis evaluates the best interest of the child. *See In re D.S.*, 333 S.W.3d 379, 384 (Tex. App.—Amarillo 2011, no pet.). It is presumed that the prompt and permanent placement of the child in a safe environment is in her best interest. *See* TEX. FAM. CODE ANN. § 263.307(a); *In re D.S.*, 333 S.W.3d at 383.

There is also a strong presumption that the child's best interest is served by maintaining the parent-child relationship. *In re L.M.*, 104 S.W.3d 642, 647 (Tex. App.—Houston [1st Dist.] 2003, no pet.). Thus, we strictly scrutinize termination proceedings in favor of the parent. *In re N.L.D.*, 412 S.W.3d 810, 822 (Tex. App.—

27

Texarkana 2013, no pet.). And because of the strong presumption in favor of maintaining the parent-child relationship and the due process implications of terminating a parent's rights to her minor child without clear and convincing evidence, "the best interest standard does not permit termination merely because a child might be better off living elsewhere." *In re J.G.S.*, 574 S.W.3d 101, 121–22 (Tex. App.—Houston [1st Dist.] 2019, pet. denied) (internal quotations omitted); *see also In re W.C.*, 98 S.W.3d 753, 758 (Tex. App.—Fort Worth 2003, no pet.). Termination of parental rights should not be used as a mechanism to merely reallocate a child to better and more prosperous parents. *In re J.G.S.*, 574 S.W.3d at 121–22; *In re W.C.*, 98 S.W.3d at 758; *see also In re E.N.C.*, 384 S.W.3d at 809; *In re C.R.*, 263 S.W.3d 368, 375 (Tex. App.—Dallas 2008, no pet.).

Moreover, termination is not warranted "without the most solid and substantial reasons." *Wiley v. Spratlan*, 543 S.W.2d 349, 352 (Tex. 1976) (internal quotations omitted); *see also In re N.L.D.*, 412 S.W.3d at 822. In parental-termination proceedings, DFPS's burden is not simply to prove that a parent should not have custody of her child; DFPS must meet the heightened burden to prove, by clear and convincing evidence, that the parent should no longer have any relationship with her child whatsoever. *See In re K.N.J.*, 583 S.W.3d 813, 827 (Tex. App.—San Antonio 2019, no pet.); *see also In re J.A.J.*, 243 S.W.3d 611, 616–17 (Tex. 2007) (distinguishing conservatorship from termination).

In determining whether the termination of mother's and father's parental rights was in the best interest of A.M.M., we may consider several factors, including: (1) the child's desires; (2) the current and future physical and emotional needs of the child; (3) the current and future emotional and physical danger to the child; (4) the parental abilities of the parties seeking custody; (5) whether programs are available to assist those parties; (6) plans for the child by the parties seeking custody; (7) the stability of the proposed placement; (8) the parents' acts or omissions that may indicate that the parent-child relationship is not proper; and (9) any excuse for the parents' acts or omissions. *See Holley v. Adams*, 544 S.W.2d 367, 371–72 (Tex. 1976); *In re L.M.*, 104 S.W.3d at 647. We may also consider the statutory factors set forth in Texas Family Code section 263.307. *See* TEX. FAM. CODE ANN. § 263.307; *In re A.C.*, 560 S.W.3d 624, 631 n.29 (Tex. 2018); *In re C.A.G.*, No. 01-11-01094-CV, 2012 WL 2922544, at *6 & n.4 (Tex. App.—Houston [1st Dist.] June 12, 2012, no pet.) (mem. op.).

These factors are not exhaustive, and there is no requirement that DFPS prove all factors as a condition precedent to the termination of parental rights. *See In re C.H.*, 89 S.W.3d at 27; *see also In re C.L.C.*, 119 S.W.3d 382, 399 (Tex. App.—Tyler 2003, no pet.) ("[T]he best interest of the child does not require proof of any unique set of factors nor limit proof to any specific factors."). The absence of evidence about some of the factors does not preclude a fact finder from reasonably

forming a strong conviction or belief that termination is in the child's best interest. *In re C.H.*, 89 S.W.3d at 27; *In re J.G.S.*, 574 S.W.3d at 122.

On the other hand, a lack of evidence on one factor cannot be used as if it were clear and convincing evidence supporting termination of parental rights. *In re E.N.C.*, 384 S.W.3d at 808; *In re J.G.S.*, 574 S.W.3d at 122. In some cases, undisputed evidence of only one factor may be sufficient to support a finding that termination was in the child's best interest, while in other cases, there could be "more complex facts in which paltry evidence relevant to each consideration mentioned in *Holley* would not suffice" to support termination. *In re C.H.*, 89 S.W.3d at 27; *see also In re J.G.S.*, 574 S.W.3d at 122. The presence of scant evidence relevant to each factor will generally not support a finding that termination of parental rights was in the child's best interest. *In re R.H.*, No. 02-19-00273-CV, 2019 WL 6767804, at *4 (Tex. App.—Fort Worth Dec. 12, 2019, pet. denied) (mem. op.); *In re A.W.*, 444 S.W.3d 690, 693 (Tex. App.—Dallas 2014, pet. denied).

### 1. A.M.M.'s Desires

When the parental rights of mother and father were terminated, A.M.M. was two years old. Thus, A.M.M. was not able to directly express her desires. Generally, when a child is too young to express her desires, this factor is considered neutral. *See In re A.C.*, 394 S.W.3d 633, 643 (Tex. App.—Houston [1st Dist.] 2012, no pet.).

30

DFPS caseworker Deese testified that mother had been "actively participating in th[e] case," including attending visits with A.M.M. Deese described mother's visits with A.M.M. as "good" and stated that mother acted appropriately at visits. Mother loved A.M.M., and A.M.M. loved her. Mother's bond with A.M.M. was "healthy," and mother was "positive around" A.M.M. during their Zoom visitations. *See In re C.V.L.*, 591 S.W.3d 734, 754 (Tex. App.—Dallas 2019, pet. denied) (evidence parent did not miss visits with child, parent loved child, parent and child had bond, and parent worked hard to do what he needed to do to get child back weighed against termination of parental rights).

As to father, Deese explained that DFPS did not have a problem with father being appointed as a possessory conservator of A.M.M. According to Deese, father and A.M.M. were bonded, and A.M.M. recognized father at their in-person visits. Child Advocates volunteer Philo also testified that father and A.M.M. were bonded, father loved A.M.M., and father was appropriate during his in-person visits with the child. A.M.M.'s foster family was willing to allow father to remain in A.M.M.'s life if acceptable terms could be reached. *See id.* (evidence parent did not miss visits with child, parent loved child, parent and child had bond, and parent worked hard to do what he needed to do to get child back weighed against termination of parental rights).

31

Father testified that he loved A.M.M. and his relationship with her was "[a]wesome." He stated that he did not want his parental rights to A.M.M. to be terminated, but he was willing to work out an agreement where A.M.M. could remain with her foster family and he could have visitation with her. Father was also willing to provide financial support to A.M.M.'s foster family if his rights were not terminated and A.M.M. continued living in with her foster family.

A.M.M. had been in the same foster home since the termination case began in August 2018. Deese testified, without detail, that A.M.M. was thriving in her placement and that her foster home was "good." Philo summarily stated that A.M.M.'s foster home was stable and loving. No additional information about A.M.M.'s foster placement was admitted into evidence at trial. *See In re D.N.*, No. 12-13-00373-CV, 2014 WL 3538550, at *3–5 (Tex. App.—Tyler July 9, 2014, no pet.) (mem. op.) (holding evidence insufficient to support termination of parental rights and noting DFPS caseworker and children's attorney ad litem did not provide any facts to form basis of opinion); *In re A.H.*, 414 S.W.3d 802, 807 (Tex. App.—San Antonio 2013, no pet.) (holding evidence insufficient to support best-interest finding where no evidence elicited about children's current caregivers or environment caregivers would provide children).

## 2. Current and Future Physical and Emotional Needs and Current and Future Physical and Emotional Danger

### a. Condition of Home

A child needs a safe and stable home. *See* TEX. FAM. CODE ANN. § 263.307(a) (prompt and permanent placement of child in safe environment presumed to be in child's best interest); *In re G.M.G.*, 444 S.W.3d 46, 60 (Tex. App.—Houston [14th Dist.] 2014, no pet.) (parent who lacks ability to provide child with safe and stable home is unable to provide for child's emotional and physical needs).

DFPS caseworker Deese testified that mother had her own home, which was stable and suitable for A.M.M. Mother was financially able to support A.M.M., and mother was participating in AA's "12-Step Program." Mother completed her parenting classes and had participated in family-therapy sessions.

Mother testified that she was capable of parenting A.M.M., she had the financial ability to care for A.M.M., and she had a place for A.M.M. to live. Mother planned to continuing participating in AA and working on her "12-Step Program" if A.M.M. was returned to her care. There is no evidence that domestic violence occurred in mother's home. According to mother, father never struck her, hit her, pushed her, or kicked her. Father did not yell at mother in front of A.M.M. *See In re C.V.L.*, 591 S.W.3d at 754–55 (evidence parent's home suitable for child to live there, parent could financially support child, and parent had maintained sobriety and continued attending NA meetings weighed against termination of parental rights);

33

*see also Toliver v. Tex. Dep't of Family & Protective Servs.*, 217 S.W.3d 85, 101 (Tex. App.—Houston [1st Dist.] 2006, no pet.) (DFPS had burden to rebut presumption that best interest of children was served by keeping custody with natural parent).

As to father, Deese testified that he lived with his mother and he had been employed "off and on with his job." Deese did not know whether father had a job at the time of trial, but she speculated that "he probably ha[d] obtained a new one." Deese summarily opined that father "need[ed] his own place." Deese did not consider father's living arrangement with his mother to be stable because father was not on the lease agreement. Yet, Deese noted that DFPS did not have a problem with father being appointed as a possessory conservator of A.M.M.—meaning that DFPS did not consider the purported lack of stability in father's home to be a reason to terminate father's parental rights. According to Deese, father was participating in a "12-Step Program" and NA. *See In re C.V.L.*, 591 S.W.3d at 754–59 (evidence parent had maintained sobriety and continued attending NA meetings weighed against termination of parental rights); *see also Toliver*, 217 S.W.3d at 101 (DFPS had burden to rebut presumption that best interest of children was served by keeping custody with natural parent). Father also testified he was participating in AA and NA.

34

As to A.M.M.'s current placement, it is undisputed that A.M.M. had been in the same foster home since the termination case began in August 2018. Child Advocates volunteer Philo testified that it was an adoptive home, but A.M.M.'s foster family would still be willing to raise A.M.M. even if she had contact with mother and father. Deese testified, without detail, that A.M.M. was thriving in her placement and that her foster home was "good." Philo, without explanation, described A.M.M.'s foster home as stable and loving. *See In re D.N.*, 2014 WL 3538550, at *3–5 (holding evidence insufficient to support termination of parental rights and noting DFPS caseworker and children's attorney ad litem did not provide any facts to form basis of opinion); *In re A.H.*, 414 S.W.3d at 807 (holding evidence insufficient to support best-interest finding where no evidence elicited about children's current caregivers or environment caregivers would provide children). Conclusory opinion testimony, even if uncontradicted, does not amount to more than a scintilla of evidence; it is no evidence at all. *See In re A.H.*, 414 S.W.3d at 807; *see also City of San Antonio v. Pollock*, 284 S.W.3d 809, 818 (Tex. 2009) (opinion is conclusory "if no basis for the opinion is offered[] or the basis offered provides no support"); *Arkoma Basin Expl. Co. v. FMF Assocs. 1990–A, Ltd.*, 249 S.W.3d 380, 389 (Tex. 2008) (witness cannot "simply state a conclusion without any explanation" or ask trier of fact to just "take [her] word for it" (internal quotations omitted)).

35

### b. A.M.M.'s Needs

DFPS caseworker Deese testified that A.M.M. did not have special needs. *See In re C.V.L.*, 591 S.W.3d at 754–55 (holding evidence factually insufficient to support finding termination of parental rights in best interest of child where no evidence in record that child had any needs aside from basics such as housing and sustenance); *In re D.D.M.*, No. 01-18-01033-CV, 2019 WL 2939259, at *5, *8 (Tex. App.—Houston [1st Dist.] July 9, 2019, no pet.) (mem. op.) (holding evidence factually insufficient to support finding termination of parental rights in best interest of children where no evidence children had any special physical needs). Although Child Advocates volunteer Philo stated that A.M.M. was vulnerable due to her age, no detail was provided at trial as to what Philo meant by such a statement, and there was no evidence that A.M.M. was vulnerable in any particular way. Further, there is nothing in the trial record to establish that A.M.M.'s physical and emotional needs differ in any respect to those of other children her age. *See In re E.N.C.*, 384 S.W.3d at 808 (no evidence presented indicated that children's needs differ from other children or would go unmet if children were returned to parent); *In re E.W.*, 494 S.W.3d 287, 300–01 (Tex. App.—Texarkana 2015, no pet.). Likewise, the record does not show that either mother or father failed to meet A.M.M.'s physical and emotional needs while she was previously in their care. *See In re W.C.*, 98 S.W.3d

at 758 (no evidence presented at trial showed parent had failed to meet children's needs in past).

According to Deese, Mother completed her required parenting classes, had stable housing, completed her psychosocial evaluation, followed the recommendations from the evaluation, and completed individual therapy. Mother acted appropriately during her visits with A.M.M., and mother's visits with A.M.M. were "good." Philo admitted that mother had parented her older children, D.L.W.W. and J.A.W., for "quite some time" before they were removed from mother's care.

Mother testified that she was capable of parenting A.M.M. and she had the financial ability to care for the child. Mother had a stable place for A.M.M. to live, and she agreed to comply with any additional requirements that would be placed on her so that A.M.M. could be returned to her care, including participating in in-home parenting classes.

Although Deese and Philo expressed concern during their testimony about mother's purported and unspecified "intellectual disabilities," which they thought could impact mother's ability to parent A.M.M., both witnesses acknowledged that mother had never been diagnosed with any intellectual disabilities and Philo conceded that no expert had ever reported that mother had an intellectual problem. *See In re D.N.*, 2014 WL 3538550, at *3–5 (holding evidence insufficient to support termination of parental rights and noting DFPS caseworker and children's attorney

37

ad litem did not provide any facts to form basis of opinion). Despite the fact that Deese testified that DFPS wanted "a recommendation from a professional person stating that . . . it[] [was] okay to return" A.M.M. to mother's care, Deese did not testify that DFPS had actually ever sought out "a recommendation from a professional person" about returning A.M.M. to mother's care. Neither Deese nor Philo were even able to articulate what "intellectual disabilities" or intellectual impairment they believed that mother suffered from, and they did not provide any detail in their testimony. Deese only confusingly testified that mother "thank[ed] God for everything" and "for her distress, it's kind of hard." It is unclear from the record how this testimony relates to a purported intellectual disability. DFPS presented no expert testimony at trial concerning mother's alleged intellectual disabilities or intellectual impairment.[37]

As to father, Deese testified that he had completed "everything" on his FSP. He lived with his mother, and he had been employed "off and on with his job" during

---

[37] To the extent that mother's brief states that mother is "intellectually challenged," no evidence admitted at trial showed that she was "intellectually challenged." Mother also did not admit or concede at trial that she was "intellectually challenged." *See In re E.F.*, 591 S.W.3d at 142 n.4 ("The only evidence that can support the trial court's order is that evidence *admitted at trial*." (emphasis added)). Further, mother's brief does not state that her purported "intellectual[] challenge[]" affected her ability to parent A.M.M., and her brief provides no detail or diagnosis concerning any unspecified "intellectual[] challenge[]." We do not consider the statements in mother's brief to be judicial admissions as to her intellectual capabilities. *See Smuck*, 407 S.W.3d at 842; *see also Fayette Cty.*, 2017 WL 1244440, at *3 n.1.

the pendency of the case. Although Deese wanted father to get his "own place," she also stated that DFPS did not have a problem with father maintaining his parental rights to A.M.M. and with him being appointed as a possessory conservator of A.M.M.[38] According to Deese, father was participating in a "12-Step Program" and in NA. Father attended in-person visits and Zoom visits with A.M.M. During his Zoom visits, father talked to A.M.M. Philo stated that father acted appropriately in his in-person visits with A.M.M. and A.M.M.'s foster family was willing to allow father to remain in A.M.M.'s life if acceptable terms could be reached.

Deese also noted that father was bonded to mother's two older children, D.L.W.W. and J.A.W., and she stated that father was "pretty good" with them and they had a bond with father.

Father testified that he had an "[a]wesome" relationship with A.M.M., and he was willing to work out a visitation agreement with A.M.M.'s foster family if his parental rights to the child were not terminated. Father stated that he would provide financial support to A.M.M.'s foster family. According to father, he participated in AA and NA, and he had completed the requirements of his FSP.

Although Deese testified that A.M.M. was thriving in her placement, no evidence was presented at trial concerning the foster family's ability to meet

---

[38] Deese testified that father sometimes made unspecified "inappropriate comments" during his visits with A.M.M., but no detail was provided by Deese as to the content of father's comments or how they were inappropriate.

A.M.M.'s current and future needs. *See In re D.N.*, 2014 WL 3538550, at *3–5 (holding evidence insufficient to support termination of parental rights and noting DFPS caseworker and children's attorney ad litem did not provide any facts to form basis of opinion); *In re A.H.*, 414 S.W.3d at 807 (conclusory testimony by caseworker, even if uncontradicted, not sufficient to establish termination of parental rights in children's best interest); *see also Pollock*, 284 S.W.3d at 818; *Arkoma Basin*, 249 S.W.3d at 389. There was also no evidence presented that addressed A.M.M.'s precise physical and emotional condition at the time of trial. *See In re D.T.*, Nos. 07-19-00071-CV, 07-19-00072-CV, 2019 WL 3210601, at *6–9 (Tex. App.—Amarillo July 16, 2019, no pet.) (mem. op.) (holding evidence factually insufficient to support finding termination of parental rights in best interest of children where "[n]o caregiver testified" and "no evidence otherwise addressed the children's physical and emotional condition at the time of [the] final hearing"); *see also In re E.N.C.*, 384 S.W.3d at 808–10 ("A lack of evidence does not constitute clear and convincing evidence.").

### c. Domestic Violence

The record does not contain any evidence that mother or father ever acted aggressively or violently toward A.M.M. or toward mother's older children, D.L.W.W. and J.A.W. And there is no evidence that mother or father ever abused D.L.W.W., J.A.W., or A.M.M. *See In re E.N.C.*, 384 S.W.3d at 808–10 ("A lack of

evidence does not constitute clear and convincing evidence."); *In re J.C.*, No. 12-19-00102-CV, 2019 WL 3940803, at \*4–5 (Tex. App.—Tyler Aug. 21, 2019, no pet.) (mem. op.); *see also In re E.C.A.*, No. 01-17-00623-CV, 2017 WL 6759198, at \*13 (Tex. App.—Houston [1st Dist.] Dec. 28, 2017, pet. denied) (mem. op.) (noting children had not been abused by parent); *In re J.P.*, No. 02-10-00448-CV, 2012 WL 579481, at \*9 (Tex. App.—Fort Worth Feb. 23, 2012, no pet.) (mem. op.) (holding evidence factually insufficient to support finding termination of parental rights in child's best interest where grounds for terminating parent's rights did not involve allegations of physical or sexual abuse of child by parent).

Notably, DFPS did not have a problem with father being appointed as a possessory conservator of A.M.M.—indicating that DFPS did not feel that father posed enough of a danger to A.M.M. that would require the termination of his parental rights. Similarly, Child Advocates volunteer Philo testified that mother's parental rights to D.L.W.W. and J.A.W. should not be terminated, and Philo did not feel that returning D.L.W.W. and J.A.W. to mother's care would be dangerous or detrimental to those children. This would seem to indicate that Child Advocates did not feel that mother posed a danger to her older children that would require the termination of her parental rights.

Although we recognize that Philo testified that D.L.W.W. and J.A.W.'s therapist had heard about "domestic violence situations," Philo did not provide any

context or detail. And no evidence at trial stated that the purported domestic violence had occurred in the home of mother or father. There is no real indication in the trial record about what, if any, sort of domestic-violence allegations had "com[e] out" during the case.

DFPS caseworker Deese expressed concern that mother and father had two incidents in which they disagreed in front of the children during visits with them, but she stated that there were no physical altercations between mother and father.[39] Deese described it as "a verbal back and forth," and she stated that it was not unexpected that mother and father would bicker during a stressful situation.

Mother testified that father had never struck her, hit her, pushed her, or kicked her. Father also had not verbally abused mother, and he did not yell at her. He did not use curse words in front of the children, and he did not call mother names in front of the children. There is no evidence in the record of domestic violence being perpetrated by mother or father or in their homes.

### d. Narcotics Use

DFPS caseworker Deese testified that DFPS filed its petition, in August 2018, seeking termination of the parental rights of mother and father, in part, "due to substance abuse." Deese, without detail or timeframe, stated that mother and father

---

[39] It is unclear from the record whether all three children attended visits with mother and father together or whether mother's and father's visits with A.M.M. were separate from their visits with D.L.W.W. and J.A.W.

"kept testing positive" for marijuana and cocaine use, but it is unclear when the positive-testing results occurred. Narcotics-use testing results for mother or father were not admitted into evidence at trial.

Deese also testified that mother and father tested negative for narcotics use on November 20, 2019[40] and in September 2019. Father tested negative for narcotics use on July 10, 2019. And Deese stated that mother and father tested negative for narcotics use on May 1, 2019.[41] When asked whether mother and father had tested negative for narcotics use for "multiple months," Deese responded, "That is correct." Deese stated that mother had not tested positive for narcotics use by urinalysis since August 23, 2018. Deese also confirmed that father had tested negative for alcohol use "over the last year and a half, almost two years" before trial.[42] Father last tested positive for narcotics use in September 2018, right after the termination case began.[43]

---

[40] November 20, 2019 was the last time that mother and father were asked to submit to narcotics-use testing.

[41] Deese contradicted herself during her testimony, stating that mother last tested positive for cocaine use on May 1, 2019 by a hair-follicle test. Even if mother had tested positive for cocaine use on May 1, 2019, this would have occurred about thirteen months before her parental rights to A.M.M. were terminated.

[42] Deese contradicted herself during her testimony and stated that father last tested positive for alcohol use on July 10, 2019. Child Advocates volunteer Philo testified that the last time father tested positive for alcohol use was in July 2019. This would have occurred about a year before father's parental rights to A.M.M. were terminated.

[43] Deese stated that father tested positive for cocaine, benzodiazepine, and alcohol use in September 2018.

43

Deese acknowledged that mother and father had sponsors and were participating in "12-Step Program[s]." According to Deese, mother participated in AA and father participated in NA. Deese noted that there was no requirement that mother complete her "12-Step Program" before A.M.M. could be returned to her care.

Mother acknowledged that she had used narcotics in the past, but she stated that she had not used marijuana since 2017 or 2018 and had not used methamphetamine since 2017. Mother testified that she planned to continue participating in AA and working on her "12-Step Program" even if A.M.M. was returned to her care.

Father acknowledged that he tested positive for narcotics use and alcohol use at the beginning of the termination case, but he stated that he had been participating in AA for a year and he attended AA meetings once or twice a week.[44] Father also participated in NA. At the time of trial, father had not tested positive for narcotics use or alcohol use for more than a year. Father testified that he had last used cocaine and methamphetamine at the end of 2018 and he had last used marijuana about a year before trial. It had been a year since father had consumed alcohol.

---

[44]  During another portion of his testimony, father stated that he had been participating in AA for a couple of months.

44

Father admitted that he had been convicted of the offense of possession of a controlled substance, namely cocaine, in September 2014 and his punishment was assessed at confinement for thirty days. However, he had not had any "criminal law problem[s]" since 2014.

Narcotics use by a parent is not desirable. *See In re C.V.L.*, 591 S.W.3d at 756 (agreeing parent's narcotics use constituted adverse factor to be considered in best-interest analysis); *see also In re J.N.*, 301 S.W.3d 429, 433–35 (Tex. App.—Amarillo 2009, pet. denied) (although parent tested positive for narcotics use, holding evidence factually insufficient to support trial court's finding that termination of parental rights in best interest of child). But at the time that the trial court terminated their parental rights, mother and father had not tested positive for narcotics use or alcohol use for a significant amount of time, and they had been actively engaged in programs to help with their substance-abuse issues. *See In re C.V.L.*, 591 S.W.3d at 754–59 (holding evidence factually insufficient to support finding termination of parental rights in child's best interest where parent had become sober and maintained sobriety).

Further, despite being aware of mother's and father's history with substance abuse, DFPS did not have a problem with father being named as A.M.M.'s possessory conservator—indicating that it did not believe that father's substance-abuse issues required termination of his parental rights. And Child

Advocates volunteer Philo testified that mother's parental rights to D.L.W.W. and J.A.W. should not be terminated—indicating that Child Advocates did not believe that mother's substance-abuse issues required termination of her parental rights. *See In re C.V.L.*, 591 S.W.3d at 754–59 (refusing to hold, solely based on evidence of parent's narcotics use, evidence was sufficient to support termination of parental rights); *In re E.C.A.*, 2017 WL 6759198, at *9–13 (holding evidence factually insufficient to support finding termination of parental rights in children's best interest, although "[m]other was a synthetic marijuana user[,] . . . left the blunts from her drug use within reach of the children[, and] . . . tested positive for cocaine on the same day that the [FSP] was approved by the trial court" and while she was pregnant); *In re J.P.*, 2012 WL 579481, at *8–9 (holding evidence factually insufficient to support finding termination of parental rights in best interest of child even though parent "had been abusing drugs for years and had used crack, cocaine, and marijuana during the month prior to trial"); *Turner v. Lutz*, 685 S.W.2d 356, 360–61 (Tex. App.—Austin 1984, no writ) (evidence of parent's "alcohol problem" did not include any evidence showing emotional or physical danger to children).

### e. Criminal History

Mother acknowledged that in 2011 and 2014 she was convicted of the offense of prostitution, and she was sentenced to ten days' confinement for each offense. Mother stated that she had not had any "criminal law problems" since 2014. Father

acknowledged that he was convicted of the offense of possession of a controlled substance, namely cocaine, in September 2014, and his punishment was assessed at confinement for thirty days. He had not had any "criminal law problem[s]" since 2014.

The record does not show that mother and father have an extensive history of criminal convictions or lengthy incarcerations, and no evidence was presented at trial explaining how mother's two criminal convictions and father's one criminal conviction, the last of which occurred about three years before A.M.M.'s birth and about five years before their parental rights were terminated, posed a danger to A.M.M. *Cf. In re J.B.*, No. 02-18-00034-CV, 2018 WL 3289612, at *4–7 (Tex. App.—Texarkana July 5, 2018, no pet.) (mem. op.) (parent's criminal history "showed a long pattern of unlawful, dangerous behavior that resulted in his repeated incarceration and bore on whether the factfinder could trust [parent] to responsibly and capably raise [child] to adulthood"); *In re Z.L.W.*, No. 01-12-00736-CV, 2013 WL 396270, at *5 (Tex. App.—Houston [1st Dist.] Jan. 31, 2013, no pet.) (mem. op.) (parent's pattern of committing criminal offenses constituted evidence of current and future danger to child).

### 3. Parental Abilities, Plans for A.M.M., Stability of Proposed Placement, and Availability of Assistance

#### a. Mother

DFPS caseworker Deese testified that mother engaged in the services required by her FSP and she had completed "everything" in her FSP. *See In re N.J.H.*, 575 S.W.3d at 835 (whether parent complied with FSP proper consideration in best-interest analysis and parent's compliance with FSP weighed in parent's favor and against termination); *cf. In re A.L.W.*, No. 01-14-00805-CV, 2015 WL 4262754, at *12 (Tex. App.—Houston [1st Dist.] July 14, 2015, no pet.) (mem. op.) (fact finder could infer from parent's *failure* to take initiative to complete services required to regain possession of her children that parent did not have ability to motivate herself to seek out available resources needed now or in future). Mother completed her required parenting classes, had stable housing, completed her psychosocial evaluation, followed the recommendations from her evaluation, and completed individual therapy. When mother was asked to participate in family-therapy sessions later on in the case, she did so.[45] Mother had her own home, which Deese stated was suitable for A.M.M., and mother received income. According to Deese, mother had been "actively participating in th[e] case." She had

---

[45] Mother participated in family-therapy sessions with D.L.W.W. and J.A.W. It is unclear from the trial record whether mother was ever asked to participate in family-therapy sessions with A.M.M or whether A.M.M. participated in family-therapy sessions.

48

attended court hearings and visits with A.M.M. Deese noted that mother was participating in a "12-Step Program" and AA. Mother had a sponsor.

Deese also testified that mother loved A.M.M. and A.M.M. loved mother. Mother's bond with A.M.M. was "healthy" and mother was "positive around" A.M.M. during their Zoom visitations. Mother's visits with A.M.M. were "good." Deese noted that mother was sweet and kind to her older children, D.L.W.W. and J.A.W., and those children wanted to be returned to mother's care.[46] Deese had never seen mother hurt A.M.M. or "say something negative."

Child Advocates volunteer Philo testified that mother was always willing to complete whatever requirements that had been asked of her, and even when "new issues ha[d] evolved" during the case, mother had been agreeable to working to make sure that she was a better parent.

Mother testified that she loved A.M.M. and she did not want her parental rights to be terminated. She had completed the requirements that had been asked of her, and she was capable of parenting A.M.M.[47] Mother had the financial ability to

---

[46] Child Advocates volunteer Philo did not believe that mother's parental rights to D.L.W.W. and J.A.W. should be terminated.

[47] As previously noted, Deese and Philo expressed concern about mother's purported and unspecified "intellectual disabilities," which they thought could impact mother's ability to parent A.M.M. Again, however, both witnesses acknowledged that mother had never been diagnosed with any intellectual disabilities. *See In re D.N.*, No. 12-13-00373-CV, 2014 WL 3538550, at *3–5 (Tex. App.—Tyler July 9, 2014, no pet.) (mem. op.) (holding evidence insufficient to support termination of parental rights and noting DFPS caseworker and children's attorney ad litem did not

care for A.M.M. and a place for A.M.M. to live. Mother planned to continue participating in AA and working on her "12-Step Program." Mother agreed to comply with any requirements that were placed on her so that A.M.M. could be returned to her care. Mother was also willing to work with A.M.M.'s foster family in order to be able to maintain contact with A.M.M. if the child was not returned to mother's care, but mother's parental rights were not terminated.

### b. Father

DFPS caseworker Deese testified that father engaged in the services required by his FSP and he had completed "everything" in his FSP. *See In re N.J.H.*, 575 S.W.3d at 835 (whether parent complied with FSP proper consideration in best-interest analysis and parent's compliance with FSP weighed in parent's favor and against termination); *cf. In re A.L.W.*, 2015 WL 4262754, at *12. Father also participated in family-therapy sessions. Although, in Deese's opinion, father's living arrangement with his mother was not stable, Deese also testified that DFPS did not have a problem with father maintaining his parental rights to A.M.M. and

provide any facts to form basis of opinion). Further, neither Deese nor Philo were even able to articulate what "intellectual disabilities" or intellectual impairment they believed that mother suffered from, much less how those purported disabilities might affect mother's ability to care for A.M.M. Deese only confusingly testified that mother "thank[ed] God for everything" and "for her distress, it's kind of hard." It is unclear from the record how this testimony relates to a purported intellectual disability. DFPS presented no expert testimony at trial concerning mother's purported intellectual disabilities or intellectual impairment.

being appointed as a possessory conservator of A.M.M.—indicating that DFPS did believe that father's living arrangement required his parental rights to A.MM. to be terminated. Deese recognized that father was participating in a "12-Step Program," with a sponsor, and in NA. Deese did testify that sometimes, during his visits with A.M.M., father made unspecified "inappropriate comments," but such testimony was not expanded upon and additional evidence was not presented at trial. Notably though, whatever the unspecified "inappropriate comments" consisted of did not affect DFPS's opinion that father could still be granted possessory conservatorship of A.M.M.

Deese also testified that father was "pretty good" with mother's older children, D.L.W.W. and J.A.W., and they were bonded with him, even though he was not their biological father. Child Advocates volunteer Philo testified that father's visits with A.M.M. were appropriate and they were also bonded. Significantly, Philo acknowledged that A.M.M.'s foster family was willing to allow father to remain in A.M.M.'s life.

Father testified that his relationship with A.M.M. was "[a]wesome" and he loved A.M.M. Father explained that he had not tested positive for narcotics use or alcohol use for more than a year before trial and he participated in AA, NA, and a "12-Step Program." And he completed his FSP. *See In re N.J.H.*, 575 S.W.3d at 835; *cf. In re A.L.W.*, 2015 WL 4262754, at *12. Father was willing to work out an

agreement where A.M.M. could remain with her foster family and he could have visitation with the child.

### c. A.M.M.'s Foster Placement

As previously noted, the record contains no evidence of the condition of A.M.M.'s current foster placement. There is also no evidence regarding the parental abilities of the A.M.M.'s foster parents or the environment that they have provided for A.M.M. *See Horvatich v. Tex. Dep't of Protective & Regulatory Servs.*, 78 S.W.3d 594, 601–04 (Tex. App.—Austin 2002, no pet.) (holding evidence insufficient to support finding termination in best interest of children where record not developed concerning current circumstances of children); *see also In re E.N.C.*, 384 S.W.3d at 808.

The only information in the record about A.M.M.'s current foster placement is DFPS caseworker Deese's conclusory opinions that the foster home was "good" and safe and that A.M.M. was thriving. Child Advocates volunteer, Philo, similarly testified, without detail, that A.M.M.'s foster placement was stable and loving. *See In re D.N.*, 2014 WL 3538550, at *3–5 (holding evidence insufficient to support termination of parental rights and noting DFPS caseworker and children's attorney ad litem did not provide any facts to form basis of opinion); *In re A.H.*, 414 S.W.3d at 807 (holding evidence insufficient to support best-interest finding where no

evidence elicited about children's current caregivers or environment caregivers would provide children).

Notably, Deese acknowledged that A.M.M.'s foster family was willing to raise her even if A.M.M. still had contact with mother and father. And Philo testified that A.M.M.'s foster family was willing to allow father to remain in A.M.M.'s life if acceptable terms could be reached.

DFPS must support its allegations against a parent, including its allegation that termination of parental rights was in the best interest of a child, by clear and convincing evidence; conjecture or a preponderance of evidence is not enough. *See In re E.N.C.*, 384 S.W.3d at 808–10; *see also In re R.H.*, 2019 WL 6767804, at *4; *In re A.W.*, 444 S.W.3d at 693 (presence of scant evidence relevant to each factor will generally not support finding that termination of parental rights is in child's best interest); *Toliver*, 217 S.W.3d at 101 (DFPS had burden to rebut presumption that best interest of children was served by keeping custody with natural parent). This is a high evidentiary burden that DFPS must meet, especially considering the presumption that the child's best interest is served by maintaining the parent-child relationship.[48]  *In re E.C.A.*, 2017 WL 6759198, at *13; *In re R.W.*, No.

---

[48]  We note that during her testimony, DFPS caseworker Deese stated that mother's parental rights should be terminated simply because DFPS had a lot of permanent-managing conservatorship cases which "get stagnant." It is imperative to remember that "[a]ctions which break the ties between a parent and a child can never be justified without the most solid and substantial reasons," "[p]articularly in

01-11-00023-CV, 2011 WL 2436541, at *12 (Tex. App.—Houston [1st Dist.] June 16, 2011, no pet.) (mem. op.).

Although we recognize that the trial court and the parties in this proceeding had many hearings before the date of trial, we emphasize that none of the previous hearings constitute evidence that can support the trial court's order terminating the parental rights of mother and father to A.M.M. Similarly, the documents contained in the clerk's record, of which the trial court did not take judicial notice, cannot be used to support the trial court's termination of mother's and father's parental rights to A.M.M. The only evidence that can support the trial court's order is the evidence admitted at trial.[49] *See In re E.F.*, 591 S.W.3d 138, 142 n.4 (Tex. App.—San Antonio 2019, no pet.).

We are cognizant of the extraordinary burdens placed on all participants in a termination-of-parental-rights case, but given the constitutional rights of the parents involved in such a proceeding, the interests of the child involved, and the effect that

---

an action which permanently sunders those ties." *Wiley v. Spratlan*, 543 S.W.2d 349, 352 (Tex. 1976) (internal quotations omitted). As we have explained above, "[t]he natural right which exists between [a] parent[] and [her] child[] is one of constitutional dimensions," and Texas courts have "always recognized the strong presumption that the best interest of a [child] is usually served by keeping custody in the natural parent[]." *Id.* Factors to be considered in determining whether termination of parental rights is in the best interest of a child do not include the busyness of DFPS's caseload.

[49] The reporter's record from trial in this case is less than 100 pages. No exhibits were admitted into evidence during trial. *Cf. In re E.F.*, 591 S.W.3d at 142 n.4.

placement of the child will have on numerous lives, it is imperative that the parties completely develop the evidence at trial. *See id.* The quality and quantity of evidence required to make such a momentous decision should be the same whether the parties have sought to have the matter decided by a jury or by the court. *See* TEX. CONST. art. I, § 15. There is a reason the law sets a high evidentiary bar for the termination of parental rights. *See Santosky*, 455 U.S. at 753–54 ("The fundamental liberty interest of natural parents in the care, custody, and management of their child does not evaporate simply because they have not been model parents or have lost temporary custody of their child to the State. . . . If anything, persons faced with forced dissolution of their parental rights have a more critical need for procedural protections . . . .").

Here, viewing the evidence in a neutral light, we conclude that a reasonable fact finder could not have formed a firm belief or conviction that termination of the parental rights of mother and father was in the best interest of A.M.M. *See* TEX. FAM. CODE ANN. § 161.001(b)(2). Accordingly, we hold that the evidence is factually insufficient to support the trial court's findings that termination of the parental rights of mother and father was in the best interest of A.M.M.[50] *See id.*

---

[50] Due to the evidence of narcotics use by mother and father and our prior case law, viewing the evidence in the light most favorable to the trial court's findings, as we must when conducting a legal-sufficiency review, we conclude that the trial court could have formed a firm belief or conviction that termination of the parental rights of mother and father was in the best interest of A.M.M. *See* TEX. FAM. CODE ANN.

We sustain a portion of mother's third issue and a portion of father's third issue.

## Sole Managing Conservatorship

In her fourth issue, mother argues that the trial court erred in appointing DFPS as the sole managing conservator of the children because D.L.W.W. and J.A.W. wanted to live with mother, mother had completed her FSP, mother addressed her substance-abuse issues and continued to address them, mother was willing to complete extra services, and mother had successfully raised D.L.W.W. and J.A.W. prior to their removal from her care.

We review conservatorship decisions for an abuse of discretion. *In re J.A.J.*, 243 S.W.3d at 616; *In re J.J.G.*, 540 S.W.3d 44, 55 (Tex. App.—Houston [1st Dist.] 2017, pet. denied). A trial court abuses its discretion if its decision is arbitrary and unreasonable. *In re J.A.J.*, 243 S.W.3d at 616; *In re J.J.G.*, 540 S.W.3d at 55. Thus, in reviewing a trial court's conservatorship decision for an abuse of discretion, we examine whether the court acted without reference to any guiding rules or principles. *Low v. Henry*, 221 S.W.3d 609, 614 (Tex. 2007); *see also In re J.J.G.*, 540 S.W.3d

§ 161.001(b)(2). Accordingly, we hold that the evidence is legally sufficient to support the trial court's findings that termination of the parental rights of mother and father was in the best interest of A.M.M. *See id.*; *see also In re A.A.H.*, 2020 WL 1056941, at *7 n.4 (because legally insufficient evidence requires rendition of judgment in favor of party raising challenge, we must address it); *In re L.N.C.*, 573 S.W.3d at 315.

at 55 ("To determine whether a trial court abused its discretion, the appellate court must decide whether the court acted without reference to any guiding rules or principles, that is, whether its decision was arbitrary or unreasonable."). A trial court does not abuse its discretion when it bases its decision on conflicting evidence or so long as some evidence of substantive and probative character supports its decision. *In re J.J.G.*, 540 S.W.3d at 55.

The primary consideration in determining issues of conservatorship is always the child's best interest. *See* TEX. FAM. CODE ANN. § 153.002. "A managing conservator must be a parent, a competent adult, [DFPS], or a licensed child-placing agency." *See id.* § 153.005(b); *see also In re J.A.J.*, 243 S.W.3d at 614. Texas Family Code section 153.131 creates a rebuttable presumption that the appointment of a parent as managing conservator is in the best interest of the child unless the trial court finds that the appointment of the parent "would not be in the best interest of the child because the appointment would significantly impair the child's physical health or emotional development." *See* TEX. FAM. CODE ANN. § 153.131(a)–(b).

The trial court may appoint DFPS as the managing conservator of a child without termination of parental rights if it finds by a preponderance of evidence that:

(1)    appointment of a parent as managing conservator would not be in the best interest of the child because the appointment would significantly impair the child's physical health or emotional development; and

57

> (2)   it would not be in the best interest of the child to appoint a relative of the child or another person as managing conservator.

*Id.* § 263.404(a); *see also id.* § 161.205 (providing that, if trial court does not order termination of parental rights, court shall either "deny the petition" or "render any order in the best interest of the child"); *In re C.L.J.S.*, No. 01-18-00512-CV, 2018 WL 6219615, at *3–4 (Tex. App.—Houston [1st Dist.] Nov. 29, 2018, no pet.) (mem. op.); *In re J.J.G.*, 540 S.W.3d at 57 (Texas Family Code section 263.404 governs trial court's appointment of DFPS as child's managing conservator without termination of parental rights). In making the determination, the trial court must consider the following factors: (1) that the child will reach eighteen years old in not less than three years; (2) that the child is twelve years old or older and has expressed a strong desire against termination of parental rights or has continuously expressed a strong desire against being adopted; and (3) the needs and desires of the child. TEX. FAM. CODE ANN. § 263.404(b).

Unlike the findings necessary to support termination of parental rights, which require clear and convincing evidence, a finding that appointment of a parent as managing conservator would significantly impair a child's physical health or emotional development is governed by a preponderance of the evidence standard. *See In re J.A.J.*, 243 S.W.3d at 616; *see also* TEX. FAM. CODE ANN. § 105.005 ("Except as otherwise provided by this title, the court's findings shall be based on a preponderance of the evidence."). In determining whether the evidence supports a

trial court's determination that the appointment of a parent as managing conservator would not be in the best interest of the child because it would significantly impair the child's physical health or emotional development, courts can consider evidence of the parent's specific acts and omissions in the past, including a parent's past use of narcotics, a parent's criminal history, the parent's failure to provide stability in the home, and a parent's failure to visit or communicate with the child, as well as other parental misconduct. *See Danet v. Bahn*, 436 S.W.3d 793, 797 (Tex. 2014); *Lewelling v. Lewelling*, 796 S.W.2d 164, 167 (Tex. 1990); *In re C.L.J.S.*, 2018 WL 6219615, at *4. These circumstances need not rise to a level that warrants termination of parental rights in order to support a finding that the appointment of a parent as a managing conservator would impair the child's physical health or emotional development. *See In re J.A.J.*, 243 S.W.3d at 615–16; *In re C.L.J.S.*, 2018 WL 6219615, at *4.

Here, it is undisputed that mother used illegal narcotics at the beginning of this case. Although narcotics-use testing results were not admitted into evidence at trial, DFPS caseworker Deese testified that DFPS filed its petition on August 2, 2018, seeking termination of the parental rights of mother in part "due to substance abuse." According to Deese, mother tested positive for narcotics use by urinalysis

on August 23, 2018.[51]  Mother testified that she last used marijuana in 2017 or 2018 and she last used methamphetamine in 2017.  *See F.A.B. v. Dep't of Family & Protective Servs.*, No. 01-10-00930-CV, 2012 WL 5310024, at *3–5 (Tex. App.—Houston [1st Dist.] Oct. 25, 2012, no pet.) (mem. op.) (considering narcotics use in determining whether trial court erred in finding appointment of parent as managing conservator of children would not be in their best interest because appointment would significantly impair children's physical health or emotional development).

Mother also testified that in 2011 and 2014 she was convicted of the offense of prostitution and she was sentenced to ten days' confinement for each offense.  At the time of those offenses, D.L.W.W. would have been about three years old and six years old, respectively, and J.A.W. would have been about a year old and four years old, respectively.

Although mother had made significant progress addressing her substance-abuse issues, had a stable home that was suitable for the children, completed her parenting classes and individual therapy, and had appropriate visits with the children throughout the case, she was still participating in family-therapy sessions at the time of trial and working on the sixth step of her "12-Step Program." Child Advocates volunteer Philo recommended that DFPS be awarded managing

---

[51]  Deese, although she contradicted herself during her testimony, stated at one point that mother tested positive for cocaine use on May 1, 2019 by a hair-follicle test.

conservatorship so that mother could have more time to address her issues.  Further, despite the fact that D.L.W.W. and J.A.W.'s current placement was not ideal and they wanted to be returned to mother's care, based on the undisputed evidence of mother's past narcotics use, we conclude that there is some evidence of a substantive and probative character supporting the trial court's determination that the appointment of DFPS, and not mother, would be in the children's best interest.  Thus, we hold that the trial court did not err in appointing DFPS as sole managing conservator of the children.

We overruled mother's fourth issue.

**Conclusion**

We reverse the portion of the trial court's order terminating the parental rights of mother and father to A.M.M. and remand that portion of the case to the trial court for a new trial. *See* TEX. R. APP. P. 28.4(c); *In re J.O.A.*, 283 S.W.3d at 347. We affirm the portion of the trial court's order appointing DFPS as the children's sole managing conservator.[52]

> Julie Countiss
> Justice

Panel consists of Justices Keyes, Hightower, and Countiss.

---

[52] Father did not challenge the portion of the trial court's order appointing DFPS as A.M.M.'s sole managing conservator. *See In re J.A.J.*, 243 S.W.3d 611, 612–13 (Tex. 2007).